**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| TALON C. SILVERHORN ) | |
| ) | |
| Plaintiff, ) | |
| ) | JURY TRIAL DEMANDED |
| v. ) | Civil Action No. |
| ) | |
| COLONIAL WILLIAMSBURG FOUNDATION ) | |
| P.O. Box 1776 ) | |
| Williamsburg, VA 23187-1776 ) | |
| ) | |
| KEN TREESE (Manager of Interpretation and ) | |
| Professional Development) in his individual and | |
| official capacity. | |
| | |
| FELICITY MEZA-LUNA (Native American | |
| Interpreter) in her individual and official capacity. | |
| | |
| BRENNA LAMPE, (Human Resources Business | |
| Partner) in her individual and official capacity | |
| | |
| CHERYL RUSCHAU (Director of Museum | |
| Theater) in her individual and official capacity. | |
| | |
| Defendants. | |

**COMPLAINT**

Plaintiff, Talon C. Silverhorn, through undersigned counsel, sues Colonial Williamsburg Foundation, Ken Treese, Brenna Lampe, Cheryl Ruschau, and Felicity Meza-Luna and states as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff has received notice of his right of action against Defendants, issued pursuant to his filing a charge with the United States Equal Employment Opportunity Commission. A copy of Plaintiff's Notice of Right to Sue is attached hereto as Exhibit "A" and is incorporated herein by reference.

2. This is a civil action brought by the Plaintiff under § 706(n) of the Civil Rights

Act of 1964, 42 U. S. C. § 2000e-5(f), which confers original jurisdiction on this Court over all actions authorized by Title VII of the Civil Rights Act of 1964. This action states federal claims against defendants for discrimination on the basis of hostile work environment, sexual harassment, quid pro quo discrimination and retaliation, all under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq.

3. This action is brought by the Plaintiff Talon C. Silverhorn (herein, "Silverhorn"), to secure redress for Defendant's violation of his civil rights to be free from workplace discrimination and harassment on the basis of his sex. Both Federal and Virginia laws prohibit harassment in the workplace against any of the classes of employees protected under federal and state discrimination law. Silverhorn is of the protected class as a Native American male. Silverhorn has been subject to illegal and intolerable conditions including statements and other behaviors of his supervisor and fellow employee that created an offensive and hostile atmosphere. Such behavior and actions were supported and caused by The Colonial Williamsburg Foundation (hereinafter "Foundation") management. Foundation failed to take all reasonable steps necessary to prevent the occurrence of discrimination and harassment. To the extent a policy exists that would expressly prohibit such an intolerable workplace, the system was ignored and failed to protect Silverhorn. It appears that despite repeated complaints there was no investigation or reasonable steps taken to prevent or remediate such behavior.

4. Foundation had a duty to take prompt corrective action. Inaction following notice results in employer liability. At all times mentioned herein, Defendants were acting in a managerial and supervisorial role with full knowledge of the conduct and behavior described.

5. Plaintiff seeks compensatory damages, attorneys' fees, and cost.

## THE PARTIES

6. At all times relevant to this action, Plaintiff, Silverhorn, was and is a resident of Williamsburg, Virginia and is a citizen of the United States of America. At all times relevant to this action, Silverhorn was employed by Colonial Williamsburg Foundation located at 101 S. Henry St., in the city of Williamsburg, in the state of Virginia, in the Easter District of Virginia.

7. At all times material to this Complaint, Defendant The Colonial Williamsburg Foundation (hereinafter "Foundation") is a Virginia non-for-profit educational institution that operates a living history museum. Foundation employs approximately 3500 employees and is located at 100 Visitor Center Drive, Williamsburg, Virginia but receives correspondence at P.O.

Box 1776 Williamsburg, Virginia 23187-1776. Foundation is a recipient of federal financial assistance as well as state funding.

8. At all times material to this Complaint, Defendant Ken Treese (herein, "Treese") is an adult resident of Williamsburg, Virginia. The Defendant Treese was at all times, relevant to this case, employed by and an agent of the corporate defendants in this matter. During all of the actions complained of in this case, Defendant Treese was acting in the scope of his employment with the Defendants.

9. At all times material to this Complaint, Defendant BRENNA LAMPE, (herein, "Lampe") is an adult resident of Williamsburg, Virginia. The Defendant Lampe was at all times, relevant to this case, employed by and an agent of the corporate defendants in this matter. During all of the actions complained of in this case, Defendant Lampe was acting in the scope of her employment with the Defendants.

10. At all times material to this Complaint, Defendant CHERYL RUSCHAU (Herein, "Ruschau") is an adult resident of Williamsburg, Virginia. The Defendant Ruschau was at all times, relevant to this case, employed by and an agent of the corporate defendants in this matter. During all of the actions complained of in this case, Defendant Ruschau was acting in the scope of her employment with the Defendants.

## JURISDICTION AND VENUE

11. Jurisdiction over these claims is invoked pursuant to 28 U.S.C. § 1331, 1332, 1343, and 1367.

12. Additionally, Silverhorn invokes the supplemental jurisdiction of this Court to hear and decide claims arising under the referenced state law pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b).

14. Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## FACTUAL ALLEGATIONS

15. Foundation operates a 301-acre living history museum in Williamsburg, Virginia, where Foundation employees interact personally with visitors to create an authentic 18th Century environment. Foundation employs Historic Interpreters who are viewed as a mix of historian, actor, and tour guide for visitors to the museum.

16. Historic Interpreters portray what life was like for men and women in Colonial Williamsburg through their costume and speech. As part of the interpretation Historic

Interpreters may portray many different scenarios requiring two employees to be husband and wife, or father and daughter, or two friends. Specifically, Native American Interpreters provide a third person interpretation of life in the 18th century providing relevant information from a modern-day setting. Actors are afforded much liberty with their interpretations allowing the actors to improvise the interpretation and lead the subject matter of the interpretations.

17. As part of the historical interpretation, Foundation provides a Native American Interpreter Unit which consists of five Native American Interpreters who are supervised by Ken Treese (herein, Treese)., Manager of Interpretation and Professional Development.

18. Silverhorn joined the Native American Interpreters Team in May 2017.

19. Silverhorn's duties include acting and appearing as a Native American from the 18th century. His position requires him to wear period clothing including a breechcloth and leggings which leave the legs bare.

20. Foundation provides a dressing area for the Interpreters to change from their normal clothing on location before and after the completion of their time at work.

21. Throughout his tenure with the team Silverhorn performed his duties as expected and always met or exceeded the expectations of Foundation.

22. The Native American Interpreter Team also employed a female employee, Felicity Meza-Luna (herein, Meza-Luna).

23. Silverhorn and Meza-Luna worked together without incident for approximately a year and half. However, during that time there were many incidents with Meza-Luna and other Foundation employees that were brought to the attention of Foundation.

24. In and about August and September 2018, Meza-Luna started singling Silverhorn out during interpretations by making colorable statements that could be misconstrued as sexual in nature. Silverhorn requested that Meza-Luna cease this practice, but she refused.

25. Meza-Luna's behavior continued to escalate with the events described as followed:

    a. Meza-Luna consistently made remarks about Silverhorn's sex and made numerous statements to Foundation guest, in the breakroom, staff training, and Foundation meetings that "ALL" men rape and abuse women.

    b. Meza-Luna continuously stated that there was too much testosterone around and made statements about men's presence being offensive.

    c. Meza-Luna often stated that she should carry pink glitter around to throw on Silverhorn and other male co-workers to decrease their manhood.

    d. Meza-Luna made the statement, "What will you give me for the return of your 'stick ball?'", putting great emphasis on "stick ball";

    e. Meza-Luna made the statement, "You know I am NOT flirting with you, don't you?"

    f. Meza-Luna stalked Silverhorn in the basement where one bathroom is located and then to the parking lot, without cause of reason.

    g. Meza-Luna made repeated comments about Silverhorn's breechcloth stating that she could see "his stuff".

    h. Meza-Luna stated to that she wanted to have Native American babies and she was running out of time.

    i. Meza-Luna continuously made statements to Silverhorn about men to place him in a position of defense so she could dominate any given situation.

    j. Meza-Luna constantly made statements that she wanted to date a native man and that the native dating population in Williamsburg was extremely small pointing out that Silverhorn was the ONLY single person on the team and that her biological clock was ticking. "I need a native baby quick by a native male."

    k. During an interpretation Meza-Luna took the stick ball from Silverhorn and taunted him. Meza-Luna stuck out her chest to Silverhorn and asked "what are you gonna give me for it?"

26. The frequency and severity of Meza-Luna's behavior continued to increase and worsen to the point that Silverhorn could not long avoid or ignore her actions.

27. Silverhorn reported the incidents to Treese and Treese advised that he discussed his concerns with Meza-Luna. However, the actions of Meza-Luna continued and Silverhorn felt more uncomfortable. Silverhorn could find no evidence that Treese had addressed his concerns with Meza-Luna.

28. In fact, it appeared that Treese was supporting Meza-Luna and enabling her actions to intensify.

29. In October 2018, after Meza-Luna's actions continued and began to worsen, Silverhorn advised Treese again that there was a problem and Treese set up a meeting with Brenna Lampe (herein, "Lampe") of the Human Resources Department and Cheryl Ruschau (herein, "Ruschau") a manager. Silverhorn advised that he was continuously being sexually harassed by a co-worker and that he had already reported several instances to his direct supervisor, Treese, who had taken no action.

30. During the same time period there was a meeting with Lampe, during which, Silverhorn confided in Lampe that he was celibate due to his religion/culture, thus emphasizing to Lampe why Meza-Luna's sexual harassment was so unwanted and needed to be addressed.

31. During the meeting Lampe attempted to turn the action against Silverhorn, advising him that Silverhorn needed to be careful because he did not want to make a female employee feel uncomfortable. Lampe advised that she would investigate the situation. After the meeting, Treese, Lampe, and Ruschau took no further action.

32. Silverhorn requested that he not be scheduled alone with Meza-Luna and Lampe and Ruschau advised that they would discuss with Treese to change the schedule so that Silverhorn and Meza-Luna were not schedule together while the matter was investigated.

33. Silverhorn feared that he was going to lose his position because the Foundation and his direct supervisor, Treese seemed to be supporting the actions of Meza-Luna. Treese continued to receive complaints from Silverhorn and continued to support Meza-Luna, advising Silverhorn that he felt he needed to protect Meza-Luna because she was female. Treese repeatedly advised Silverhorn that he was being sensitive, was misunderstanding Meza-Luna's intent and it was all a miscommunication on Silverhorn's behalf.

34. Later, Treese advised that there was no intent to start an investigation by Treese, Lampe, Ruschau, or any other employee of Foundation. Silverhorn asked Treese if Human Resources would consider the situation serious enough if the genders were reversed. Treese admitted that if Silverhorn was female, he believes they would take the complaints seriously.

35. Being further empowered by the knowledge that Foundation would take no action against her, Meza-Luna continued to flirt and make inappropriate comments to Silverhorn both in private and in front of Foundation guests.

36. The behavior of Meza-Luna did not go unnoticed by other Native American Interpreters.

37. With no other recourse, Silverhorn reported to Rushau what Treese had said returned to Human Resources and reported that the situation was worsening and requested that someone intervene on his behalf because he could not continue his position with the constant stress of the harassment.

38. Silverhorn was advised that Human Resources would take the matter more serious this time and would in fact start an investigation and promptly change his schedule as previously advised.

39. Again, no action was taken by anyone at Foundation and the schedule continued to remain the same enabling Meza-Luna to continue her sexual harassment of Silverhorn. When Silverhorn pointed out to Treese that he was not supposed to be scheduled alone with Meza-Luna Treese responded that Silverhorn should act "like an adult".

40. A meeting was set up with Silverhorn and Lampe who admitted that Meza-Luna was creating a hostile work environment and that Lampe needed to act more quickly to resolve the issue.  Again, Lampe advised that she would make sure that Silverhorn and Meza-Luna were not scheduled together. Silverhorn asked Lampe if he should still report his concerns to Treese. Lampe said yes.

41. After this meeting, Treese advised Silverhorn that he realized that he had not been handling the situation properly and that he apologized for his inaction.

42. Silverhorn continued to be scheduled alone with Meza-Luna and Meza-Luna's behavior turned more aggressive. Meza-Luna would send guests to Silverhorn, directing them to ask why she is not allowed to sit in the same tent as him and why he does not like her. Additionally, Meza-Luna cussed at Silverhorn when she was scheduled with him.

43. Silverhorn continued to follow the direction of Human Recourses and advise Treese. Treese's response was that Meza-Luna was just "exercising her frustrations." Silverhorn stopped reporting issues to Treese when he walked by Treese's office to hear him speaking with Meza-Luna. Silverhorn overheard Treese state to Meza-Luna that he and HR do not believe Silverhorn and that "**we** will get through this together".

44. With no other options seemingly available, Silverhorn timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).

45. After Foundation was notified of the EEOC complaint and action they began to have trainings for the Native American Interpreters which seemed to target Silverhorn and

empower Meza-Luna. Silverhorn was advised by Lampe that she wanted to have weekly meetings with him.

46. During one such session, Silverhorn was the only individual in attendance and the meeting consisted of Lampe and another, advising Silverhorn that because of his Native American race and religion/culture, of which Silverhorn confided in Lampe back in October regarding his celibacy, that he may not have understood Meza-Luna's behavior and had interpreted it improperly.

47. The EEOC issued Silverhorn a "right to sue" letter on August 27, 2019.

**(TITLE VII - SEXUAL HARASSMENT)**

48. Plaintiff incorporates herein by reference the allegations made above as though fully set forth herein.

49. Defendants, their agents and employees have discriminated against Plaintiff by sexually harassing Plaintiff and by failing to implement and enforce a sufficient policy against sexual harassment. These practices of discrimination against Plaintiff are in direct violation of his rights guaranteed by Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e et seq. and the Civil Rights Act of 1991.

50. Defendants' supervisor's conduct was unwelcome.

51. The conduct was based on Plaintiff's sex.

52. The conduct was sufficiently severe or pervasive to alter the Plaintiffs working conditions of employment and to create an abusive working environment.

53. The conduct was imputable on some factual basis, as outlined in the complaint, to Defendants.

54. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial pecuniary losses, severe humiliation, mental anguish, pain and suffering, and endangerment to his security and physical well-being.

**COUNT**
**UNLAWFUL DISCRIMINATORY PRACTICE BASED ON GENDER**

55. Plaintiff incorporates herein by reference the allegations made above as though fully set forth herein.

56. Virginia Statute § 2.2-3901 protects all individuals within the state from unlawful

employment discrimination on the basis of sex.

57. Silverhorn is a member of a protected class.

58. As described above, Silverhorn was an exemplary employee who sought the protection of his employer to protect him against sexual advances by Meza-Luna.

59. When Silverhorn reported the incidents to Defendants, Treese, Lampe, and Ruschau, Silverhorn's complaints were ignored and he was advised that he could not be sexually harassed because he was a male, that he was being sensitive, and needed to act like an adult.

60. The disrespect and intolerance towards women are believed to be commonplace and accepted as harassment and sexual discrimination, however, it is often overlooked when the complaining party is of the male gender.

61. When Silverhorn complained to his direct supervisor, Treese and Human Resources, Trampe and manager Ruschau, each made excuses for Meza-Luna's behavior.

62. In fact, Treese acknowledges that Meza-Luna's behavior would be addressed if she were a male and the victim was a female.

63. When Silverhorn went through all the proper channels adopted by the policies of Foundation to get relief and assistance, he was greeted with dismissive attitudes in support of the violator and advise that he did not understand because of his race and culture.

64. As a result of this, Defendants created a hostile work environment which left Silverhorn without opportunities afforded to other employees and the same protections as granted to Meza-Luna.

## COUNT
## UNLAWFUL DISCRIMINATORY PRACTICE BASED ON RACE

65. 31. Plaintiff incorporates herein by reference the allegations made above as though fully set forth herein.

66. 32. Virginia Statute § 2.2-3901 protects all individuals within the state from unlawful employment discrimination on the basis of race and religion.

67. Silverhorn is a member of a protected class as an enrolled member of the Cherokee Nation in Oklahoma

68. As a result of this objective and objectionable behavior was that Silverhorn was made to feel uncomfortable and harassed at work despite requesting assistance from management.

69. During the time period of this action, Treese was put in the position of Silverhorn's direct supervisor, Lampe employee within Human Resources, and Ruschau is the Manager over Treese.

70. Foundation through its agents failed to act on behalf of Silverhorn believing that Silverhorn's race, culture, and gender was the issue instead of the elephant in the room allowing Silverhorn to be harassed on a daily basis.

71. As a result of Silverhorn being told that he was misunderstanding the harassment that he was experiencing because of his Native American race and culture Silverhorn was so discouraged that he stopped complaining of the harassment, became emotionally distressed and began to experience physical signs of illness when he had to report to work.

## COUNT
## NEGLIGENT INFFLICTION OF EMOTIONAL DISTRESS

72. Plaintiff incorporates herein by reference the allegations made above as though fully set forth herein.

73. The conduct of the Defendants as described above was extreme, outrageous and intentional. Such behavior was conducted with deliberate disregard of the high degree of probability of the severe emotional distress and such behavior would cause Plaintiff.

74. As a direct and proximate result of the Defendant's extreme, outrageous and malicious conduct Plaintiff suffered severe mental distress anxiety, nervousness, and humiliation and allied injures.

75. Silverhorn has suffered extreme anxiety, weight gain and loss, humiliation, and insomnia.

76. Silverhorn had lost his confidence and his sense of dignity is destroyed.

77. Punitive damages as described below are warranted for this and the above causes of action.

## COUNT
## HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT

78. Plaintiff incorporates herein by reference the allegations made above as though fully set forth herein.

79. 42 U.S.C. § 2000e-2(a) provides that it is an unlawful employment practice for an employer to "(1) discriminate against any individual with respect to his compensation, terms.

Condition, or privileges of employment, because of such individual's ... sex ...; or (2) to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex."

80. Silverhorn is a member of a protected group, that is a Native American male.

81. The defendant, by through its employees, managers and general mangers, violated Silverhorn's rights under Title VII (42 U.S.C. § 2000e, et seq.), by engaging in actions and/or activities constituting hostile work environment, sexual harassment against Plaintiff.

82. These violations by defendants were based on Silverhorn's sex and affected the terms, conditions, and/or privileges of Silverhorn's employment.

83. As a direct and proximate result of the unlawful conduct of defendant, Silverhorn has suffered, and will in the future suffer, great damages including loss of career opportunities, promotions and advancements; loss of retirement benefits; loss of fringe benefits; embarrassment; humiliation and inconvenience; severe mental anguish, stress; pain and suffering; loss of enjoyment of life and other non-pecuniary injury in amounts to be determined at trial.

84. In addition, Silverhorn has incurred, and continues to accrue attorney's fees and other costs related to the prosecution of this action.

## COUNT
## INJUNCTIVE RELIEF

85. The need to enjoin Defendants, their agents and employees from depriving Plaintiff and other males of equal employment opportunities are paramount. Section 706(g) of the Civil Rights Act of 1964, 42 U. S. C. § 2000e(g), empowers this Court to permanently enjoin the Defendants from any and all violations of the rights that Plaintiff herein seeks to assert under Title VII of the Civil Rights Act of 1964, as amended.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them, jointly and severally, as follows:

1. An Order permanently enjoining and restraining Defendants, their agents, officers, servants and employees from sexually harassing other male employees; and from failing to implement and enforce a sufficient policy against sexual harassment.

2. Compensation for back pay, front pay, and compensation for other lost

employment benefits in an amount to be later determined;

    3.      Costs and reasonable attorneys' fees against Defendants;

    4.      Compensatory and punitive damages in the amount of Three Hundred Thousand Dollars ($300,000.00) for each count; and

    5.      Any and all additional relief as the Court may deem appropriate.

Date:  November 18, 2019

                              Respectfully submitted,

                              /s/William Akers_____
                              The Akers & Cleator Law Group P.L.L.C.
                              291 McLaws Circle, Suite 1
                              Williamsburg, VA 23185
                              peyton@aclawva.com
                              Tel: 757-707-8838
                              Fax: 757-707-8828

                              Shira L. Hedgepeth*
                              The Law Office of Shira Hedgepeth, PLLC
                              PO Box 514
                              Cullowhee, NC 28723
                              Tel: 828-585-5044
                              Fax: 828-585-6097
                              shira@legal-decisions.com

*Shira L. Hedgepeth simultaneously files her Application to Qualify as a Foreign Attorney Under Local Civil Rule 83.1(D) seeking leave to participate pro hac vice.

## JURY DEMAND

Plaintiff requests a jury trial and reserves the right to Amend this Complaint.

                              /s/William Akers_____
                              William Akers